```
 1                    UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF WASHINGTON
    _____
 3
    JOHN R. BUND II,                  )
 4  personally, as Executor of        )
    the Estate of Richard C.          )
 5  Bund, deceased, S. SCOTT          )
    JAMES and NOEL L. JAMES, a        )
 6  married couple, and on            )
    behalf of others similarly        )
 7  situated,                         )
                                      )
 8          Plaintiffs,               )  No. 2:16-cv-00920-MJP
                                      )
 9      vs.                           )  Seattle, WA
                                      )
10  SAFEGUARD PROPERTIES, LLC,        )
    a Delaware corporation,           )
11                                    )  Motion Hearing
            Defendant.                )  July 18, 2018
12  _____

13               VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE JUDGE MARSHA J. PECHMAN
14                UNITED STATES DISTRICT COURT
    _____
15

16  APPEARANCES:

17  FOR THE PLAINTIFFS:   CLAY M. GATENS
                          DEVON AMY GRAY
18                        Jeffers Danielson Sonn & Aylward
                          2600 Chester Kimm Road
19                        Wenatchee, WA 98801
                          clayg@jdsalaw.com
20                        devonG@jdsalaw.com

21                        BETH E. TERRELL
                          BLYTHE H. CHANDLER
22                        Terrell Marshall Law Group PLLC
                          936 North 34th Street, Suite 300
23                        Seattle, WA 98103
                          bterrell@terrellmarshall.com
24                        bchandler@terrellmarshall.com

25
```

```
 1   FOR THE DEFENDANT:    LEONID FELLER
                           KELLY M. MULDER
 2                         Kirkland & Ellis
                           300 North Lasalle
 3                         Chicago, IL 60654
                           leonid.feller@kirkland.com
 4                         kelli.mulder@kirkland.com

 5                         JAIME DROZD ALLEN
                           Davis Wright Tremaine
 6                         1201 Third Avenue, Suite 2200
                           Seattle, WA 98101
 7                         jaimeallen@dwt.com

 8

 9

10

11

12   Andrea Ramirez, CRR, RPR
     Official Court Reporter
13   United States District Court
     Western District of Washington
14   700 Stewart Street, Suite 17205
     Seattle, WA 98101
15   andrea_ramirez@wawd.uscourts.gov

16   Reported by stenotype, transcribed by computer

17

18

19

20

21

22

23

24

25
```

Bund v. Safeguard, 7/18/18

```
 1              THE CLERK:  This is the matter of John R. Bund vs.
 2    Safeguard Properties, Cause Number C16-920.
 3         Counsel, please make your appearance.
 4              MR. GATENS:  Good morning, Your Honor.  Clay Gatens,
 5    on behalf of plaintiffs and the class.  And I'd also like to
 6    introduce Mr. John Bund, plaintiff in this action, to the Court
 7    as well.
 8              MS. TERRELL:  Good morning, Your Honor.  Beth
 9    Terrell, from Terrell Marshall Law Group, on behalf of
10    plaintiffs and the class.
11              MS. CHANDLER:  Good morning, Your Honor.  Blythe
12    Chandler, also from Terrell Marshall Law Group, on behalf of
13    plaintiffs and the class.
14              MS. GRAY:  Good morning, Your Honor.  Devon Gray,
15    also on behalf of plaintiffs.
16              THE COURT:  Good morning, all.
17              MR. FELLER:  Good morning, Your Honor.  Leonid
18    Feller, from Kirkland & Ellis, on behalf of Safeguard.  I have
19    with me Safeguard's general counsel, Linda Erkkila.  And we
20    also have Jaime Allen, from Davis Wright, and Kelly Mulder,
21    also from Kirkland & Ellis.
22              THE COURT:  Good morning to you.
23              MR. FELLER:  Good morning, Your Honor.
24              THE COURT:  Counsel, we're here this morning on the
25    motion for a preliminary injunction.  And for the record, I'd
```

Bund v. Safeguard, 7/18/18

1   like to review that I have read the motion and reviewed the

2   attachments on plaintiffs' motion for preliminary injunction;

3   the defendant's opposition to plaintiffs' motion for

4   preliminary injunction; the reply, filed by the plaintiffs,

5   motion for preliminary injunction; and defendant's surreply and

6   motion to strike.

7        Is there anything else that I should have reviewed in

8   order to be prepared to hear you this morning?

9             MR. GATENS:  Not from plaintiffs, Your Honor.

10            MR. FELLER:  Your Honor, there are -- there were some

11   declarations filed in connection with the motion.

12            THE COURT:  Yes.  I'm talking about the full package.

13            MR. FELLER:  That's everything.  Thank you.

14            THE COURT:  You should have received questions for

15   oral argument that I sent out.  Those are questions that I'd

16   like to have you answer sometime during the argument.  It's not

17   required that you answer them up front or at the end.  You can

18   answer them in the body of your argument.  That's entirely up

19   to you.  But by the end of the day, I'd like to have some

20   answers to those questions.

21        All right.  Plaintiffs, what would you like to tell me?

22            MR. GATENS:  Good morning, Your Honor, and good

23   morning to the Court.  Again, Clay Gatens, on behalf of the

24   plaintiffs and the class.

25        As Your Honor referenced, the Court did issue some

Bund v. Safeguard, 7/18/18

1   questions to the parties, some directed to plaintiffs, some

2   directed to the defendant, and then some directed to both.  I

3   would like to just start my portion addressing those questions,

4   and I'd like to reserve five minutes for rebuttal, if I may.

5        Your Honor, the first question that the Court directed to

6   plaintiffs asks whether and how the plaintiffs have standing to

7   prevent lock changes that have not yet occurred.  And the

8   answer to that question is really twofold.

9        First, the existing plaintiffs and existing class members

10  do have Article III standing, under the U.S. Supreme Court's

11  holding in *Lyons*, because they don't have just evidence of past

12  wrongful lock changes.  Now, certainly, those past wrongful

13  lock changes are evidence of a future harm, but they are not

14  future harm, in and of themselves.  But, importantly, in this

15  case and in the record before this Court, there is both the

16  real threat of future harm as well as the immediate threat of

17  future harm.

18       And the real threat is found in the fact that the

19  defendants have produced a list, which they won't refer to as a

20  class list, but it's a list.  It's before this Court at

21  Docket 243-1 as Exhibit B, and it's also Safeguard production

22  008221.  That list identifies all class members -- it might be

23  overinclusive -- but it identifies all class members.  And we

24  have de-duplicated and sorted that list to determine that that

25  list shows over 5,000 initial lock changes and re-lock changes

Bund v. Safeguard, 7/18/18

1    on class members' properties.  That means that evidence shows

2    that the act of a wrongful lock change is not a singular act;

3    that Safeguard will go on and re-key and re-lock a property,

4    even after initial lock change, for various reasons; and that

5    that has occurred on over 5,000 class members' properties.

6         But more importantly, the defendants, in sort of an

7    alarming candor, disclosed to this Court in their response,

8    which is Docket 250, beginning at Page 3 through 4, that even

9    subsequent to the Washington State Supreme Court's decision in

10   *Jordan vs. Nationstar*, that they changed locks again, for a

11   second or more time, on the same borrower's property, both

12   prior to *Jordan* and then again after the *Jordan* decision, in

13   over 150 instances.  And then further, they disclose a couple

14   hundred -- it looks to be about 3-, maybe 400 -- more

15   post-*Jordan* lock changes on class members' properties, for

16   reasons that they state are secondary access doors or some

17   unilateral determination of abandonment that is inconsistent

18   with Washington statutory law, under RCW 7.28.230, and

19   inconsistent with the holdings of *Jordan* and its progeny.  And

20   so those are evidences of real, ongoing harms.

21        Now, importantly, with regard to an immediate threat, the

22   defendant states in its response papers -- I'd like to direct

23   the Court's attention to this -- Docket 253, Page 8,

24   Paragraph 9:  Safeguard and its vendors must perform the tasks

25   identified by the client as delineated.  Safeguard acts at the

1     discretion of its lender clients.  Safeguard cannot exercise

2     any discretion to go beyond the requested work order and client

3     direction.  This means that Safeguard says:  We conducted

4     illegal lock changes prior to the decision in *Jordan*.  We

5     conduct them repeatedly, in multiple times, on the same

6     borrower's property.  And we will continue to do so, without

7     exercising any of our own discretion, as long as our client

8     directs us to do that.  We've done it over 150 times to

9     properties, both post- and pre-*Jordan*, and we're continuing to

10    do it to new properties, if directed.  And the purpose, the

11    express purpose of these lock changes and repeated lock

12    changes, is to allow for the future and ongoing entry and

13    trespass upon these borrowers' properties.  So that's why the

14    class members have Article III standing to enjoin future lock

15    changes; because there is the immediate threat of those lock

16    changes, and they are real.

17         Now, with regard to members that are -- individuals that

18    are not currently class members, i.e. Washington borrowers that

19    they have not yet changed locks on, there is standing to enjoin

20    them under Washington law, because the plaintiffs have brought

21    this motion for preliminary injunction under the Consumer

22    Protection Act.  And Washington law, specifically, and

23    Washington State Supreme Court law, in *Hockley vs. Hargitt*,

24    82 Wn.2d 337, addresses this specific context of an attempt

25    to enjoin non-plaintiffs in the context of bringing a CPA

Bund v. Safeguard, 7/18/18

 1    action.  And *Hockley vs. Hargitt* directly says that plaintiffs

 2    can bring those motions on behalf of others because the purpose

 3    of the CPA is to protect the public interest, and, two, the

 4    plain language of 19.86.090 does not restrict a plaintiff from

 5    trying to enjoin actions against non-plaintiffs.  And,

 6    specifically, the Court said they can do this because -- even

 7    if such violation would not directly affect the individual's

 8    own property rights.

 9         And so the answer to the Court's question, under both

10    Article III constitutional standing and statutory standing

11    under Washington law and the Consumer Protection Act, is, the

12    class has a current, immediate, and real threat of ongoing lock

13    changes and future harms, as well as other members -- other

14    borrowers who are not yet a member of the class.

15         The Court asked a second question, Your Honor, and it

16    asked expressly whether the defendant's vendors, in exercising

17    possession, are they exercising possession when they secure

18    only a secondary entrance on the borrower's property.  And the

19    answer to that question is, yes, absolutely.  The borrower's

20    exclusive right to possession, under 7.28.230 and *Jordan* and

21    all of its progeny, make zero distinction based on which door

22    Safeguard is changing the lock on.  It doesn't matter if it's

23    the front door or the back door, because the act of changing a

24    lock, as the *Jordan* court has held and every federal district

25    court subsequent to that decision has held, is an act of

Bund v. Safeguard, 7/18/18

1    possession, and that disrupts the borrower's exclusive right to

2    possession.  But more importantly, again, Safeguard admits that

3    the purpose of these locks, whether they're on the front door

4    or the back door, is to allow for ongoing, unnoticed entries

5    into this borrower's home, and including the purpose of

6    reinstalling the locks if they happen to be removed.

7          THE COURT:  Your request for an injunction asks for

8    me to stop conduct going forward.  You also have some requests

9    for things that they should do immediately, going backward.

10   Those two things are very different.  And if I were to issue a

11   preliminary injunction that says you may not touch class

12   members' homes a second time, a third time, you don't touch

13   them, period, wouldn't that satisfy it?  And if you do the

14   remedial work, doesn't that diminish the damages that the class

15   members could ultimately present?

16         MR. GATENS:  Certainly, Your Honor, we are seeking

17   both a prohibitory injunction, prohibiting future actions, as

18   well as remedial injunction, or a compulsive injunction.

19         We've narrowly tailored the request for this injunction as

20   narrowly as possible.  And with respect to the remedial

21   injunction, unlike the characterization the defendant has put

22   in front of this Court, we have never asked for them to go out

23   and wholesale remove the locks.  What we've asked them to do is

24   to take reasonable efforts to contact the borrowers and let

25   them know of their right to the exclusive possession of the

Bund v. Safeguard, 7/18/18

1    property, and offer to restore it.  And we do believe that that

2    narrow request is reasonable, but it's tailored to help

3    mitigate the damages in this case.  We unabashedly seek,

4    through these motions, to reduce and mitigate the ongoing harm

5    that is happening to those borrowers.  And we feel that the

6    narrow request to contact them, inform them of their right to

7    exclusive possession, which is consistent with the recent

8    legislation that's been passed, is an appropriate measure to

9    mitigate the ongoing damages that are occurring.

10                THE COURT:  Go ahead.

11            MR. GATENS:  Your Honor, but in sum, to answer the

12   Court's question, no.  Whether it's a front door or a back door

13   does not implicate possession, under the law and the statutes,

14   and certainly the borrower whose home is going to be reentered

15   at some time, unnoticed, probably -- it's no different to them

16   whether it's happening through the front door or the second

17   door.

18        There was a third question -- this question was addressed

19   to both parties -- and it asks, what's the impact of the recent

20   House Bill 2057 legislation?  And then it also asks whether the

21   injunctive relief sought by plaintiffs supports or complies

22   with that.

23        With regard to the first question, what's the impact of

24   House Bill 2057, well, the impact of the House Bill 2057 is, it

25   just further informs the illegality of Safeguard's admitted,

Bund v. Safeguard, 7/18/18

1   stated, ongoing practices.  It in no way allows for, and, in

2   fact, directly makes further illegal, that you can change locks

3   simply because your vendor determines they can see -- or

4   abandonment, or some variation thereof.  And that legislation

5   directly informs that.

6       But it also informs that it's consistent with, again,

7   RCW 7.28.230, because House Bill 2057 did not repeal or replace

8   7.28.230.  It was expressly added to the non-foreclosure

9   statute, 6124.  And it's also consistent with longstanding law,

10  under RCW 7.28.230, that that's the exclusive right and

11  possession of the borrower.  So, if anything, what House

12  Bill 2057 does is, says, whether it's now or whether it was

13  then, how they act and how they tell this Court they're going

14  to continue to act does not comport with the law or the

15  legislature.

16      THE COURT:  All right.  But how can I give you a

17  preliminary injunction that asks for more than what the house

18  bill asks for?  In other words, if I tell them, "You have to

19  obey the house bill," isn't that all I can do?  Otherwise,

20  you've got a federal judge legislating additional requirements.

21      MR. GATENS:  I think that that's a fair point, Your

22  Honor.  And to be very clear, we are not asking for this Court

23  to rule in the nebulous fashion of, "Hey, Safeguard, you just

24  need to comply with the law."  What we're asking this Court to

25  rule is that if you are going to conduct a post-default,

1    pre-foreclosure lock change, for the first time or again, on a
2    borrower class member's property, that you either get their
3    consent, get approval from the Court -- and there's multiple
4    vehicles to do that -- or you comply with the provisions of
5    House Bill 2057.  And so that's narrowly tailored to say, if
6    you're going to do this activity -- you don't have to do it.
7    But if you're going to do it, you have to get consent, approval
8    of the Court, or you have to comply with the provisions of
9    House Bill 2057, which is why, to the second part of that
10   question, the relief sought here by plaintiffs does comport
11   with and comply with House Bill 2057.  It doesn't add
12   additional requirements, and it doesn't legislate from the
13   bench in that regard.
14        Now, with respect to the last question that was, again,
15   directed to both the plaintiff and the defendant, the Court has
16   asked that we address the impact of the dispositive -- the
17   pending dispositive motions on the injunctive relief.  And for
18   the Court's reference, there are two pending dispositive
19   motions.  There's defendant's motion to dismiss as well as
20   effectively four motion/cross-motions on some discrete issues
21   for summary judgment.
22        The answer to the Court's question is, those pending
23   dispositive motions do absolutely bear on the Court's ability
24   to issue the injunctive relief sought by the plaintiffs.
25   Because under *Winter*, and under all of the jurisprudence, one

Bund v. Safeguard, 7/18/18

1   of the elements that we must show is the likelihood to succeed

2   on the merits.  That's why plaintiffs moved, under the CPA, for

3   the injunctive relief in the CPA only, is because, again, under

4   Washington state law, that provided the statutory standing.

5   But moreover, we have shown, we believed, more than a

6   substantial likelihood that we will prevail on the merits as to

7   the CPA claim, as well as others, but specifically the CPA

8   claim.

9           THE COURT:  You moved under the CPA claim.  Are you

10  conceding, then, if the CPA claim fails, that your request for

11  preliminary injunction fails as well?

12          MR. GATENS:  It fails as to individuals or borrowers

13  in the state that have not yet had a lock change conducted on

14  them.  It doesn't fail as to the existing class members that

15  already have the requisite Article III standing but wouldn't

16  have -- or wouldn't, excuse me, need the statutory standing

17  that Washington state law applies for people who have not

18  experienced this yet.

19          THE COURT:  Okay.  So you see a division between

20  those that are future class members, as opposed to the ones who

21  are already here.

22          MR. GATENS:  I do, Your Honor.  And that's why I

23  think the Article III standing and the analysis under *Lyons*,

24  demonstrating evidence of a real and immediate threat, is

25  certainly applicable to the existing plaintiffs and class

Bund v. Safeguard, 7/18/18

1   members.  But I think the secondary analysis about people that
2   are not yet a member of the class but borrowers that in the
3   future could experience these lock changes -- which, again,
4   they say, unequivocally, they will do when ordered from their
5   clients -- those individuals have to have some other type of
6   standing.  And that's the statutory standing that we cite to
7   under the -- excuse me -- the *Hockley vs. Hargitt* Washington
8   State Supreme Court case.  And that's exclusively limited to
9   action brought under the CPA, again because of the public
10  interest component of that action.
11          THE COURT:  Okay.  What else would you like to tell
12  me?
13          MR. GATENS:  I would -- unless the Court has further
14  questions, I'd like to reserve some time for rebuttal, and I
15  have nothing further at this time.
16          THE COURT:  Thank you.
17          MR. FELLER:  Good morning, Your Honor.
18          THE COURT:  Good morning.
19          MR. FELLER:  Again, Leonid Feller, on behalf of
20  Safeguard.  I'd like to reserve a couple of minutes, if I need
21  to, for reply.
22      Your Honor --
23          THE COURT:  Counsel, before you get started, I want
24  to address something with you, is that, in your brief, you made
25  reference to the other motion, the CPA motion, that has been

Bund v. Safeguard, 7/18/18

1    filed, and incorporated by reference that material.  You can't

2    do that.  And so that material is not going to be considered at

3    this time.  But what I will tell you is, I'm not going to issue

4    any ruling until I've had a chance to evaluate both motions.

5         MR. FELLER:  Thank you, Your Honor.  And I apologize

6    to the Court.  Obviously, we intended no disrespect.  And we

7    were in a situation -- as you know, we were brought into the

8    case, I think, in late March.  And within three weeks, we had

9    literally four sets of very significant briefing due at the

10   same time.  So that's why that happened, and I apologize.

11        Your Honor, there are five very basic reasons why this

12   preliminary injunction motion fails.  And I'd like to run

13   through them, quickly.  I'm going to try to answer the Court's

14   questions in that context.  If I don't, I will follow up.

15        Number one, standing.  And we have to look at -- at some

16   point, we have to get past the rhetoric, and we have to get to

17   the real facts of the case, and the real facts of these two

18   sets of named plaintiffs that we have, only one of whom is a

19   class representative.  The second was added after the Court's

20   class certifications.

21        As to Mr. Bund -- and I don't know how much of the recent

22   filings the Court has seen.  We had filed a motion for a status

23   conference.  Plaintiff had filed a motion to substitute -- we

24   agree, there is no dispute, that the named plaintiff in this

25   case today, Bund, does not own this property, and has not owned

1    it since 2013, and did not own it in 2015 when the lock change

2    happened.  And as a result, that plaintiff cannot have

3    standing.  And they admit it, and that's why there is a motion

4    to substitute.

5         I will get to this later, Your Honor, but about three

6    years ago, you wrote an opinion called *Reese vs. Malone*,

7    December 7, 2015.  And it's 2015 Westlaw 13450693.  And we had

8    a very similar situation, where you had -- it was a securities

9    class action.  A class was certified.  You had a named

10   plaintiff.  It turned out the named plaintiff didn't own the

11   right kind of security.  And so the plaintiffs moved to

12   substitute.  And the Court, citing Ninth Circuit law, because

13   there was -- this is Ninth Circuit law, is, you can't

14   substitute a class rep.  And what has to happen is, the case

15   has to be decertified and dismissed.  And so we'll get to all

16   of that later, but I think something there is no dispute about

17   is, the estate did not own the property at the time.  And

18   whatever happens later, as of today, the estate does not have

19   standing.

20        Beyond --

21        THE COURT:  Counsel, one of the least persuasive

22   pieces of material that you can cite to me is me.  So I hope

23   that if you're going to rely upon that, you cited somebody else

24   too.

25        MR. FELLER:  Again, this briefing hasn't happened,

Bund v. Safeguard, 7/18/18

1    but I will cite to you what you cited, which is the Ninth

2    Circuit opinion in *Lierboe vs. State Farm*, 350 F.3d 1018.

3    That's a Ninth Circuit decision, published Ninth Circuit

4    decision.

5         So that -- beyond that, Mr. Bund, we now know -- and we

6    have learned a great deal in the last four to six weeks.  We

7    know that the Bund property was vacant.  And we -- I don't want

8    to quibble about vacant versus abandoned, but we now have

9    discovery responses that say:  Yes, I admit, I wasn't living

10   there.  I wasn't sleeping there.  From Bund senior's death in

11   2011 until 2016, after the lock change, the property was

12   vacant.  Mr. Bund might stop in from time to time, once a

13   month.  He was thinking about renting it.  He was thinking

14   about selling it.  There might be some maintenance that needs

15   to be done.  But it was vacant.  And there is no dispute about

16   that fact.

17        In 2016, the property was rented.  We found that out in a

18   discovery response, about a week ago.  And about, say, three

19   weeks ago, according to Zillow -- we've subpoenaed the

20   realtor -- about three weeks ago, a contract for sale was

21   signed on the property.  And I don't know if that transaction

22   has closed or not yet.  So that's Mr. Bund.  We know the

23   estate, the actual plaintiff, doesn't own the property, and we

24   know at the time nobody was living there.

25        As far as the James plaintiffs, again, they were added, I

1    think, in April, after class cert.  We haven't deposed them

2    yet.  We don't have formal discovery.  But they have helpfully

3    submitted a declaration, which we moved to strike, which might

4    have been improvident, but the declaration says:  We moved out

5    of the house.  We were not living there.  And our son --

6    supposedly, again -- was coming by to do maintenance from time

7    to time, but we weren't living there.  And so this idea, that

8    people are being ousted from homes, we do not have.  And I

9    would challenge Mr. Gatens, when he stands up here, to name to

10   you a real, live human being in this case who was supposedly

11   living in a house and was ousted.  That is the *Jordan vs.*

12   *Nationstar* fact pattern.  Right?  It's not Safeguard.

13   Safeguard had nothing to do with that.

14       In *Jordan* -- and I want to talk more about the *Jordan*

15   case, obviously.  In *Jordan*, Mrs. Jordan woke, allegedly --

16   woke up in the morning, went to work, came home, and she

17   couldn't get into the house.  And she couldn't get in, because

18   there was only one lock.  There is nothing remotely close to

19   that with regard to Safeguard.  There is no human being who

20   alleges anything of the kind.

21       Okay.  So that's --

22           THE COURT:  Well, does there need to be?  Or is it

23   the human being's right to the property, whether or not they're

24   physically ousted, that's important?

25           MR. FELLER:  Sure.  And that is a critical issue,

Bund v. Safeguard, 7/18/18

1    Judge.  And what we desperately need in this case is an

2    interpretation of *Jordan* as to all of these other issues.  But

3    I will submit to you, Your Honor -- and I will read to you from

4    the *Jordan* case, and this will go to your question about

5    secondary locks.  This is the language from *Jordan*:  Nationstar

6    contends its usual practice is to change the locks on only one

7    door, such that it can --

8            THE COURT:  Counsel, I can't get a record on you when

9    you speak that --

10           MR. FELLER:  Let me slow down, Judge.  I'm sorry.

11       Nationstar contends -- this is Page 881 of *Jordan*:

12   Nationstar contends that its usual practice is to change the

13   lock on only one door, such that it can access the home in the

14   future, but also so that the owner can still enter through

15   another door.  Here, Jordan's home had only a front door and a

16   sliding glass door in the rear.  Therefore, when Nationstar's

17   vendor re-keyed the front door, she had no means of entry.

18   Okay.  And then they then go through:  Well, is this a problem?

19       There is no dispute, Judge, that Washington law is that

20   the homeowner gets possession of the property through

21   foreclosure.  What is new about *Jordan*, what no one had ever

22   conceived was possible, and certainly --

23           THE COURT:  I'm sorry.  I think you misspoke.  The

24   homeowner doesn't get possession through foreclosure.  The

25   homeowner loses possession through foreclosure.

Bund v. Safeguard, 7/18/18

1          MR. FELLER:  No, no, no.  Under Washington law, the

2     home is entitled to have possession through foreclosure.

3          THE COURT:  That's the word you missed.

4          MR. FELLER:  I apologize, Your Honor.

5       What was new about *Jordan* was the idea that the lock

6     change, for purposes of securing and for purposes of

7     maintenance, disrupted possession.  Now, why did the *Jordan*

8     court say that was the case?  Not because there was a lock

9     change.  Right?  Quote -- this is Page 887:  In property law,

10    possession is defined as a physical relation to the land of a

11    kind which gives a certain degree of physical control over the

12    land, and an intent so to exercise such control as to exclude

13    other members of society in general from any present occupation

14    of the land.  The key element to the property definition of

15    possession is the certain degree of physical control.  Tort law

16    requires -- similarly requires control.  In tort law, which is

17    concerned primarily with liability, a possessor of land is

18    defined -- and this is critical -- as a person who occupies the

19    land and controls it.  And they get to the conclusion:  She,

20    Ms. Jordan -- this is Page 888 -- could no longer access her

21    home without going through Nationstar.  This action of changing

22    the locks and allowing her a key only after contacting

23    Nationstar for the lockbox code is a clear expression of

24    control.  There has to be a person there.  And that person has

25    to be unable to get into the property.  That is what *Jordan* is

Bund v. Safeguard, 7/18/18

1    about.

2         You asked about the significance of HB 2057.  HB 2057 is a

3    judicial fix because nobody could figure out what it is that

4    *Jordan* meant.  *Jordan* certainly cannot mean that in every

5    circumstance, you can't do a lock change.  It can't mean that,

6    and plaintiffs admit that it can't mean that.  And so --

7    because we know that there is deeds in lieu of foreclosures.

8    We know there is bankruptcy sales.  We know there is actual

9    consent.  We know there are all sorts of circumstances where

10   lock changes are totally fine.  And plaintiffs admit it.

11        THE COURT:  Doesn't the house bill tell you that

12   there are three ways to do it, you get consent, you get a court

13   order, or you go through the process of getting the cities to

14   respond?  And those are the three ways you do it, according to

15   the rule.

16        MR. FELLER:  Your Honor, that is the three ways you

17   do it.  You don't have to take my word for it.  Right?  I'm

18   going to read to you from plaintiffs' briefs, okay.  This is

19   Docket Number 253, at Page 4.  "Plaintiffs agree that, if

20   proven, borrowers in the following categories fall outside of

21   the class definition:  Padlock only, on a non-residential

22   structure; lockbox only, without lock change; padlock and

23   lockbox only, without lock change; post-sale lock change; deed

24   in lieu of foreclosure executed prior to lock change; and

25   bankruptcy sale" -- "bankruptcy sale completed prior to lock

Bund v. Safeguard, 7/18/18

```
 1   change."
 2        Plaintiffs also say -- and this is at Docket Number 55, at
 3   2 and 3 -- Safeguard can obtain borrower consent authorizing
 4   its entry.  It can seek the appointment of a receiver.  It can
 5   bring a nuisance action.  It can seek injunctive relief.
 6   HB 2057 is a legislative fix that says:  Okay.  Here is one way
 7   that you can secure a home without having to go to court.  But
 8   it doesn't say it's the only way.  And, again, plaintiffs
 9   admit, deeds in lieu of foreclosures, bankruptcy sales, there
10   are all sorts of things that happen where a borrower --
11             THE COURT:  A bankruptcy sale is a court order.
12             MR. FELLER:  Okay.  A deed in lieu of foreclosure --
13   well, the final bankruptcy is ultimately an order, but the
14   bankruptcy sale can happen during the course of the bankruptcy.
15   I don't pretend to be --
16             THE COURT:  It's under the supervision of the
17   provisions of the Court --
18             MR. FELLER:  Sure.
19             THE COURT:  -- and deed in lieu of foreclosure is
20   consent.
21             MR. FELLER:  Sure.
22             THE COURT:  So of all the things that you just read
23   off, doesn't the house bill cover each of them?
24             MR. FELLER:  The house bill is -- there's no question
25   that the house bill today is one way to go secure a property.
```

1    But the point -- the house bill came after *Jordan*.  Right?

2           THE COURT:  Well, what's the harm to you in a

3    preliminary injunction if I tell you you have to follow the

4    house bill?

5           MR. FELLER:  Well, Your Honor, the question isn't

6    following the house bill -- and Safeguard does follow the house

7    bill.  And, basically, the policy is to follow the house bill

8    now, because that makes things really simple.  And so we know

9    that the number of lock changes post-*Jordan* has now

10   substantially decreased.

11      But the question isn't really what is the harm to

12   Safeguard.  The harm to Safeguard, Judge, is that there are

13   going to be -- and there's also a question, right -- what these

14   come down to is the facts of any given situation.  Right?  And

15   if someone at some point says, "Well, the affidavit that you

16   got from the code enforcement officer was defective," we're now

17   not only accused of violating the house bill, we're now accused

18   of violating your injunction.

19          THE COURT:  Not if the injunction and the house bill

20   are the same.

21          MR. FELLER:  Well, but -- correct.  But, Your Honor,

22   there are all sorts of things that happen where, inadvertently,

23   somebody screws up.  Right?

24          THE COURT:  But that's exactly what the injunction is

25   supposed to prevent, is the screwups.  Because it says:  You've

Bund v. Safeguard, 7/18/18

1   got to be careful, and you've really, really, really got to be

2   careful.

3        MR. FELLER:  And, Your Honor -- respectfully, Your

4   Honor, I think it has -- the question has it backwards.  Right?

5   Because the question isn't what's the harm to Safeguard.  The

6   question is -- the burden is, you've got to show irreparable

7   harm to get the injunction.  And we know there isn't any

8   irreparable harm to Mr. Bund, who doesn't have standing.  We

9   know there isn't any irreparable harm to the James.

10       THE COURT:  Well, let me go back to my question,

11  though, is, what difference does it make to Safeguard if

12  there's an injunction that says you have to follow the house

13  bill?  That should be obvious; right?

14       MR. FELLER:  Your Honor, Safeguard absolutely has to

15  follow the house bill.  There is no question.  But there are

16  also other avenues, other -- right?  The house bill doesn't

17  talk about bankruptcy sales.  The house bill doesn't talk about

18  deeds in lieu of foreclosure.  The house bill doesn't talk

19  about express consent.  The house bill is a mechanism that

20  doesn't purport to be exclusive.  So what your order would have

21  to say is, it would have to go through a litany of every

22  possible circumstance.  And that's exactly what the *Jordan*

23  court said we're not going to do.  Right?

24     What the *Jordan* court said is:  Okay.  These entry

25  provisions in mortgage contracts aren't a get-out-of-jail-free

1    card.  But there's a whole second part to the *Jordan* holding,

2    and that is:  Okay.  We're also not going to tell you that

3    receivership is the exclusive mechanism to go -- we don't know,

4    and we're not going to talk about, all the different ways that

5    you can go and do this.  That's not what this is about.  What

6    we're saying is that in this circumstance, where somebody wakes

7    up in their house in the morning, and is locked out at night,

8    and can't get in through the single door, that violates the

9    law.  Okay?

10        By the way, we had three dissenters in *Jordan* who didn't

11   disagree with that basic proposition.  The three dissenters in

12   *Jordan*, on the facts of the case, said:  Hey, majority, you've

13   got this all wrong.  This property was abandoned.  And because

14   this property was abandoned, under the restatement, that's an

15   exception, and you can go secure.  And so that's what the

16   dissent says.

17        But, Your Honor, if I can just run through five reasons --

18   we're at one.

19        Your Honor, again, as far as the class -- first of all, we

20   don't even have a 23(b)(2) class.  Right?  And so we got an

21   order from you, before my time on the case, when we moved to

22   strike the class certification order, and said:  Safeguard, I

23   don't know what you're worried about.  This isn't a (b)(2)

24   class, so injunctions aren't even in play here.  And if we're

25   worried about injunctions, it's got to be Bund; doesn't have

Bund v. Safeguard, 7/18/18

1   standing.  James, their foreclosure closed a long time ago.  As

2   far as future folks, that's the *Zapata* case, 753 F.2d 727,

3   Ninth Circuit.  Got to be parties to the case.  You can't give

4   injunctions about future harm, to some future people, in

5   something that may happen in the future.

6        Third reason, every single one of these folks has an

7   adequate remedy at law.  First adequate remedy, there is no

8   dispute that notices are posted on every single one of these

9   houses, with a phone number.  All you've got to do is pick up

10  the phone.  That's what happened to Ms. Jordan when she got in

11  that night.  That's what happened to Mr. Bund.  Took a little

12  while, but he got in too.

13       So there is no question -- there is, again, rhetoric that,

14  "Well, gee, somebody might see the notice, and they'll get

15  intimidated, and might not call."  No human being, no evidence,

16  no one before you that that's true.  All you've got to do is

17  pick up the phone and call.  But, again, even if you do that,

18  don't do that, all of this is compensable by money damages.

19  Mr. Bund, what was he doing in 2015 when he couldn't get in?

20  He says, "I was trying to get the house ready for rent," which

21  he does in 2016.  And so if he can't get the house ready for

22  rent, if he loses two months of rent, that can be taken care of

23  in money damages.  The James plaintiffs, they're gone.  They

24  say they've moved out of the house.  And their damage is,

25  "Well, we would have done some more repairs to the house

Bund v. Safeguard, 7/18/18

```
 1   and" -- I don't know.  Compensable by money damages.
 2        Your Honor, public interest.  And I mentioned -- and I'm
 3   sorry -- I mentioned the declarations.  And if you haven't had
 4   a chance already, I do think the Marcel Bryar declaration is
 5   critically important to read; because I'm not a big believer in
 6   experts who are just experts, and that's what they do.  Marcel
 7   Bryar ran the Fannie Mae program under the Obama
 8   administration, with respect to keeping people in their house,
 9   with respect to loan modifications.  Fannie Mae and Freddie and
10   Ginnie Mae collectively own 60 percent of the mortgages in this
11   house -- in this country.
12        And what Mr. Bryar says is, this idea that banks, or banks
13   through Safeguard, want folks out of their homes is a fantasy.
14   I mean, again, it's good rhetoric, but it's the exact opposite
15   of what anybody really wants.  Because if someone is in
16   default, and you're the mortgage company, you're the lender,
17   you're missing out on principle, you're missing out on
18   interest, maybe property taxes, but you have someone in the
19   house, taking care of it.  And with our preliminary injunction
20   motion, we gave you pictures of, I think, the James property,
21   which was vacant, and one other one, and what happens to
22   properties when they're vacant.  And so what lenders
23   desperately want, even if somebody is in default, is for them
24   to stay in the house through foreclosure, because they take
25   care of the house.  And only if, in fact, the property is
```

Bund v. Safeguard, 7/18/18

1   abandoned does it need to be secured.  Because if it's not
2   secured, then you've got crime, you've got fire, you've got
3   blight, and you have all of those things that happen.
4        Your Honor, lastly, in terms of the injunction -- if I can
5   find it -- I don't know how this order would read.  The order
6   that plaintiffs requested that you enter talks about
7   prohibiting lockbox changes, talks about prohibiting lockboxes.
8   It talks about prohibiting padlocks.  It talks about all sorts
9   of things that they now concede is -- are permissible, you
10  know, in their briefing.  And where they get to in their reply
11  is, and I think sort of what you're asking me about is:  Well,
12  can we get Safeguard to just follow HB 2057?  And I think the
13  problem is, if you look at HB 2057, it will say to you, this is
14  not an exclusive -- there are all sorts of other things that
15  happen.
16       THE COURT:  Well, at least the two examples that you
17  gave, I already told you, I think, are part of the house bill.
18  And so I'm not quite understanding that point.
19       MR. FELLER:  Well, so, Your Honor -- well, look.  So
20  I think we, at some point, are going to need a ruling on, if a
21  property is abandoned, can you do a lock -- at some point,
22  we're going to need a ruling on, if the only thing that's
23  happened is a secondary door has been changed -- and we know
24  people get in on their own all the time -- is that within
25  *Jordan*?  And that's certainly not part of HB 2057.  Right?  And

Bund v. Safeguard, 7/18/18

1    so there are circumstances, and it -- we also can't necessarily

2    foresee every possible circumstance.

3          THE COURT:  Well, let me entertain this possibility.

4    *Jordan* came to us because a federal judge asked the question.

5          MR. FELLER:  Correct.

6          THE COURT:  Should a federal judge go back and ask a

7    clarification question?

8          MR. FELLER:  Sure.  Sure.  Because, Your Honor --

9    and, again, we go back to the Bryar declaration.  Your Honor, I

10   am standing here in front of you as Safeguard's counsel, and I

11   agree that the circumstance in *Jordan*, if you believe that you

12   have a mortgage document that says you can enter just on

13   default -- not Safeguard policy, by the way.  Mr. Gatens said,

14   "Oh, Safeguard will just do whatever the lenders say."

15   Safeguard will not enter a property if it's occupied, period,

16   no matter what.  Okay?

17         But in the *Jordan* situation, if you have a document that

18   says all you need is default -- somebody can be living there.

19   Go ahead and come in -- if you have that, and you have a person

20   who is actually living there, and goes to work and comes home

21   that night -- again, not Safeguard policy.  Safeguard -- you

22   get a notice that, "Hey, we found it vacant, and in three days

23   or so we'll secure it.  Call us if you're there" -- again, not

24   Safeguard -- but if that happens, that that cannot be the law,

25   and the law cannot allow that set of circumstance.  And I think

Bund v. Safeguard, 7/18/18

1    that is what the Washington Supreme Court was struggling with

2    is, we cannot say that that's okay to do, but we are addressing

3    this circumstance.  And what the dissent said is, "You're

4    wrong.  That is okay to do," not because it's okay to oust

5    people from their home.  It's okay because this property was

6    actually abandoned.

7         And so that is what the Supreme Court in *Jordan* was

8    struggling with.  And I don't think they thought about, well,

9    gee, as it turns out -- because we now know, out of 19,000

10   properties, 18,400 of them, 97 percent, we now know were

11   abandoned.  Gone.  Person doesn't even know about the lock

12   change.  You've then got another 400 where there was a lock

13   change, and the person wanted to get in, and they got in, all

14   on their own, without calling Safeguard, without calling the

15   bank.  So out of these 19,000 people, 18,400 abandoned, gone,

16   don't even know the lock change took place.  Four hundred got

17   back in on their own.  So what you're down to is 200 people

18   where there was an issue, where they needed help getting back

19   in.  And we have to figure out a way to deal with those people.

20   And I don't know if that's the bank's responsibility, or

21   Safeguard's responsibility, or if that's a Consumer Protection

22   Act claim, or a trespass claim, or a negligence claim, or

23   something else.  But we can figure out a way to deal with those

24   200 people.

25        What we have to figure out, and perhaps what the

Bund v. Safeguard, 7/18/18

```
 1    Washington Supreme Court has to figure out, is that, did we
 2    really intend that where in 98 percent of these circumstances
 3    the property is abandoned, and there's no one taking care of
 4    it, and the roofs -- again, this isn't a parade of horribles.
 5    We gave you a declaration from the guy who ran the Obama
 6    administration's program trying to keep people in their homes.
 7    Where the roofs are caving in, where people are breaking in,
 8    where equipment is being stolen, did we really intend to not
 9    allow people to take care of that situation?
10              THE COURT:  So the law is okay if only two percent of
11    the population is offended by it?
12              MR. FELLER:  Your Honor, that's -- no, it absolutely
13    isn't.  And that two percent, right, we're going to have to
14    look at those individual cases.  Right?  But what typically
15    happens, what typically happens in those two percent, okay, is
16    going to be a circumstance where someone, very often -- first
17    of all, there's just screwups.  Right?  I'm supposed to go to
18    734 Government Lane, and I went to 743.  And it's just a
19    screwup.  Right?  It's a human endeavor.
20         But what typically happens is that somebody moves out of
21    the house, abandons it, and then comes back.  And so that
22    situation, right, the property was vacant, it -- the bank
23    looked -- Mr. Bund's property in 2015, when the lock change was
24    done, the grass was at 37 inches, three feet high.  Anyone who
25    looked at that property would have believed, in good faith,
```

Bund v. Safeguard, 7/18/18

1   that it was abandoned.  Okay?  Sometimes that turns out to be
2   wrong.  Sometimes the person comes back.  Right?  Sometimes --
3   I mean, there are -- you know, somebody's sick, somebody is
4   with a family member.  Things happen.  And mistakes are made.
5   And we've got to figure out -- again, there's all sorts of
6   issues surrounding that, right, whose responsibility -- is that
7   the bank's responsibility?  Is that Safeguard's?  Is that the
8   responsibility of the mom-and-pop locksmith, down the line?
9   We've got to figure out how to deal with that group.
10          But the claim that, under *Jordan*, the 98 percent who
11  abandoned their property and took off, and the bank took care
12  of the house so that it didn't burn, and so it didn't --
13  right? -- so people didn't break in, and so all those things --
14  that those people have a claim, that those people are entitled
15  to compensation, I genuinely do not believe that that's what
16  the Washington Supreme Court intended.  And I think HB 2057 is
17  an attempt to try and sort of get regular order back,
18  understanding we have to be able to secure vacant properties.
19          So if I can just get two minutes for reply.  Thank you.
20              THE COURT:  Thank you.
21      Response?
22              MR. GATENS:  Thank you, Your Honor.
23      You know, there was a lot about that that I think I won't
24  respond to, because it's not germane to the Court's questions,
25  and it's, frankly, not germane to the motion before the Court.

1   But there are a couple of representations and inaccuracies that
2   I think must be addressed, right out of the gate.
3       And the first is with this notion, this unilateral,
4   self-serving, unsupported, unsubstantiated notion that
5   98 percent of the class abandoned their properties.  If that is
6   not the fox watching the henhouse, I don't know what is.  There
7   is no evidence that they abandoned.  And, in fact, all of the
8   plaintiffs that appeared before this court had neither vacated
9   nor abandoned their property, and that's why they've been in
10  this litigation for years now.
11      But more importantly, the abandonment argument that's
12  being posited by Safeguard now is not new news.  That was well
13  argued to the Washington State Supreme Court by both Nationstar
14  and its amici, and, by the way, its amici, the FHFA, the
15  Federal Housing Finance Association, which is the guarantor,
16  the trustee for Fannie and Freddie.  So the unbiased
17  declaration, Mr. Meyer's declaration, that is pure as gold, was
18  written by the same folks and same industry that's entry
19  provision was held to be invalid.  And so it is categorically
20  incorrect to state that the Supreme Court in *Jordan* didn't
21  consider the abandonment argument, from both the named
22  defendant or its amici, and didn't categorically reject the
23  abandonment argument.
24      And further proof of that is -- I'm not going to sit here
25  and reread to the Court, verbatim, the decision in *Jordan*,

Bund v. Safeguard, 7/18/18

1   because the Court can read it for itself.  But I will reiterate

2   that what the *Jordan* court did was not narrow, whether you

3   agree with it or not.  It invalidated the entirety of the entry

4   provision, in toto.  And the knowledge of the invalidation, the

5   broad impact of *Jordan*, has actually been acknowledged by

6   Safeguard in their testimony, where they recognize the broad

7   scope of the *Jordan* decision.  And they themselves, at the

8   time, stated that it allowed for pre-foreclosure entries only

9   under the limited circumstances that plaintiffs are asking for

10  now.  The invention of a unilateral determination of

11  abandonment is not consistent with *Jordan*.  But most

12  importantly, as a matter of law, under *Howard vs. Edgren*, under

13  *Coleman vs. Hoffman*, and dating back to the late 1890s, under

14  *Norfi* [sic], the court, the U.S. -- the Washington State

15  Supreme Court has repeatedly held that 7.28.230's exclusive

16  right of possession of the borrower does not grant any right of

17  possession to the lender or its agents, including and

18  specifically in the cases of abandonment.  So the 98 percent

19  have been determined abandoned is false, but it does not

20  matter, because as a matter of law, abandonment does not give a

21  right of possession under 7.28.230.

22      So the last part that I want to leave this Court with,

23  which I think is germane -- and I don't believe I heard a

24  direct answer to the Court's question to the defendant on how

25  changing a lock isn't possession under the *Jordan* holding.  And

Bund v. Safeguard, 7/18/18

1   I think that's because the answer is, it is.  But I will leave

2   this Court with:  Why are we here?  We're here because

3   Safeguard's repeated testimony and representations to this

4   Court is:  We have conducted these lock changes on these class

5   members.  We conducted them multiple times on the same

6   property.  We will continue to do so, and we will not exercise

7   discretion.  We will take our clients' orders.  And if they

8   instruct us to order a lock change, we will do it, independent

9   of *Jordan*; we will do it independent of 7.28.230; and we will

10  do it independent of the new house bill as well.  Because they

11  won't exercise their discretion, this Court needs to.

12          THE COURT:  Thank you.

13          MR. FELLER:  Your Honor, very briefly, it's hard for

14  me when Mr. Gatens stands up here and says none of the

15  plaintiffs before you vacated or abandoned their home.  He

16  filed a declaration in this case, from the James plaintiffs,

17  saying they had moved out of their home.  There was no one

18  living there.  He has provided us with discovery.  And Mr. Bund

19  is sitting right here, saying, no one was living in the home.

20  And so we can quibble about semantics, but the reality is that

21  there is no individual before you who was living in their home

22  at the time that it was secured, simply no one.  Your Honor,

23  Mr. Gatens -- and I thought I gave him an opportunity to tell

24  you who that human being was, but there genuinely isn't one.

25      Is the change of a lock possession, under *Jordan*?  The

Bund v. Safeguard, 7/18/18

1   answer is, it depends.  The law is not that every lock change

2   is possession.  And I don't think it's possible to actually --

3   Mr. Gatens says, "Well, I'm not going to read to you what the

4   *Jordan* opinion actually says."  If you read the opinion, it is

5   impossible to read that opinion without coming to the

6   conclusion that it's driven by the specific facts of the case.

7          Two last points, Your Honor.  One is, I didn't have an

8   opportunity to talk about this alternate request:  Well, gee,

9   we should notify people whose house -- where locks have been

10  changed, we should reverse lock changes, whatever that set of

11  relief is.  Again, Your Honor, there is not a single person, a

12  single human being, who has ever come before you asking for

13  that relief.  And the reason is that those properties are

14  abandoned.

15         And so, first of all, Safeguard doesn't necessarily have

16  the ability to contact most of those people.  Again, we take

17  orders -- orders, not in terms of dictates, orders in terms of

18  how we'd like you to do this -- from the bank.  We don't

19  necessarily have the person's name.  We don't have forwarding

20  information.  We don't have the ability to contact them and

21  say, "Hi, would you like us to reverse" -- it's just not

22  something we have the ability to do.  But the reality is, just

23  doing it, what you have, the vast majority -- again, Mr. Gatens

24  says, "Well, there's no evidence."  You have the declaration.

25  You have the sworn testimony of somebody from Safeguard, who

1    they've deposed twice, who's telling you, based on all of the

2    information that we have, based on the fact these people

3    haven't contacted us, that between 97 and 98 percent of these

4    properties are vacant and abandoned, and no one has ever heard

5    from these people again.  That's the reality.

6         Last point, Your Honor, and I do want to thank you that

7    you said you would take this motion and the motion for partial

8    summary judgment together.  If -- again, we had a motion

9    requesting a status conference, but if I could just make a

10   request that you also take with those -- and if it's okay with

11   the Court, we'll file it as early as next week -- a motion to

12   decertify and a motion to dismiss this class.  Because we have

13   one named representative who admits he does not own the

14   property at issue in the case.  And there's Ninth Circuit

15   law -- and, again, for whatever it's worth, Your Honor, you've

16   written on the subject yourself.  Under those circumstances,

17   the Ninth Circuit says the class must be decertified, and the

18   case must be dismissed.  And so before we get into preliminary

19   injunctions, I think -- and, again, we just found this out.

20   Right?  The remarkable thing, to me, about the motion to

21   substitute is, they say, well, this is somehow Safeguard's

22   fault.  You've been calling it the estate all this time.  Well,

23   yeah, because that's what you told us.  That's how you filed

24   the case.

25        We know now that this property was transferred to a

Bund v. Safeguard, 7/18/18

```
 1   different legal entity in 2013.  And I think we have to deal

 2   with that issue before we do anything else.  Because if I'm

 3   right about what the Ninth Circuit says, we don't have a class

 4   rep in this case.

 5            THE COURT:  Okay.  Counsel, first, I owe you an

 6   apology, because I haven't moved on these as fast as I told you

 7   that I would.  And there's essentially two reasons for that.

 8   And the first reason is that I seem to be overly blessed or

 9   overwhelmed with President Trump's cases.  Because I managed to

10   wind up getting three of them, and they take significant

11   amounts of time, and they have to be moved on quickly.

12            The second reason, though, is really part of this

13   litigation, is that every time I get ready to issue an opinion,

14   there is another motion that is intertwined.  And so I'm left

15   with trying to sort through is there a motion that basically

16   cuts off the others, in evaluating that.  And that's a lot of

17   material.  So I apologize.  I take responsibility for that.

18            But your -- this particular piece of litigation has lots

19   of threads.  It's a little bit like a braided rope.  So I

20   promise that we will work on it, and that -- I promise that if

21   I see that we need conferences, we'll have conferences.  But

22   that's my excuse.  So we will work on this, but there are

23   others that I have to sort through to see if, are there other

24   motions that make a preliminary injunction not appropriate.

25   And I can't do that until I've had the time to work through it.
```

Bund v. Safeguard, 7/18/18

```
1        So one of the ways, though, that you can help me is, you
2   could tell me what order you think they ought to be decided in.
3   And if there is one that you believe cuts off everything else,
4   tell me so.  But that would be helpful.
5            MR. FELLER:  So, Your Honor, I think there's two.
6   And as I said, one of them I can file as soon as the Court
7   allows me to file.  But let me talk about the one that you
8   have.
9        So the one you have that cuts off everything else,
10  essentially, as a practical matter, is the motion for --
11  Safeguard's motion for partial summary judgment.  Because the
12  claim-splitting part of it is complicated, but the good faith
13  part of it, I think, is really hard to argue with.  And I think
14  it disposes of about 18,500 -- there's -- there would be 475
15  potential.  That's overstated too.  But there would be 475
16  properties potentially left, because it would cut off
17  everything pre-*Jordan*.  And it's -- I obviously don't want to
18  get into arguing it.  But I don't know even how you argue with
19  the idea that, when this court dismissed a case, the *Ocwen*
20  court dismissed a case, an opinion from the Supreme Court was
21  sought on the issue, there was three dissenters -- this is what
22  everyone's done in Washington since mortgages began.  This is
23  exactly what's done in 49 other states.  I don't know how you
24  argue that that is not good-faith conduct.  And if that's
25  right, then that disposes of, again, 98 percent of the class.
```

Bund v. Safeguard, 7/18/18

1    So that's one.

2        And, two -- and, again, the way I usually do this is, I

3    ask the Court's permission, and I talk to opposing counsel, and

4    I try to get, you know, a briefing schedule.  But two is, I

5    think, based on the disclosures that have been made within two

6    weeks, regarding ownership of the estate, I think the Court's

7    only course is going to be to decertify the class and dismiss

8    the case.

9        THE COURT:  Actually, I'm a little confused by

10   getting the Court's permission.  This isn't a district where

11   you have to have permission to file.

12       MR. FELLER:  Again, Judge, just -- candidly, Your

13   Honor, you've got at least four sets of motions before you, and

14   you've got other stuff being filed.  So I just -- I do it out

15   of respect.  If I didn't need to, then I'll just go ahead and

16   file it.  But the way I practice is, I like to do it in a

17   cooperative way.

18       THE COURT:  Well, it's not a district that does these

19   mother-may-I letters to the Court ahead of time.  I actually

20   think that's a bit silly.  But I do appreciate that it's been a

21   bit overwhelming with the numbers of motions and their

22   intertwined nature.

23       All right.  That gives me some idea.  Do the plaintiffs

24   have anything that they think is -- that I should turn to

25   first?

Bund v. Safeguard, 7/18/18

1          MR. GATENS:  Yes, Your Honor.  The answer to the
2     Court's question, the first comment that I'd have is, the
3     solution to the current caseload facing this Court is not more
4     motions.  Right?  And that's what we just heard is, we want to
5     file more motions.  I would suggest that that's not the
6     solution to the challenge that the Court is facing.

7          With regard to the current motions before the Court, of
8     which the defense has filed the majority of them, the current
9     motion, under Rule 17, which directly addresses and very simply
10    acknowledges the substitution of John Bund as the estate for
11    John Bund as the trustee of the trust, is straightforward,
12    simple, and we think properly before the Court to make a very
13    easy determination on that front.  Moving to decertify the
14    class, when there's another named class member that could be
15    recertified, this is problematic.  This is part of what we see
16    as an overburden on the court, and not efficient to the
17    judicial administration.  So a quick ruling on the Rule 17
18    motion to substitute in the trust for the estate -- it's all
19    the same human being.  It's always been the same human being.
20    It's the same property.  There's no substantive difference, and
21    Rule 17 expressly addresses that -- would make sense.

22         The motion for preliminary injunction has been pending for
23    a long time.  And the testimony that Safeguard cannot get away
24    from, can't even answer this Court, here today, about whether
25    they're going to comply with the recent house bill, means that

Bund v. Safeguard, 7/18/18

```
 1    this is ongoing, and this is immediate, and it's real.  The
 2    Court needs to -- respectfully -- enjoin that type of behavior.
 3    It is informed enough at this stage, through the multiple and
 4    repeat motions that Safeguard files about, "We couldn't have
 5    known," or, "We didn't know," to know that what it can't ever
 6    get away from, just like it can't get away from its testimony
 7    here today that it's not going to exercise discretion, is that
 8    it never undertook any review of Washington law.  If it didn't
 9    take any review of Washington law, it couldn't have been acting
10    in good faith.
11         But the Court can get to that issue when it gets to the
12    substantive issues.  It needs to address the request to
13    substitute Mr. Bund in as trustee for the estate.  It needs to
14    rule on the parties' preliminary injunction, because they have
15    shown a likelihood of success on the merits.  And then the
16    Court needs to rule on the merits of this case.  And I
17    respectfully posit that it should do that before there are more
18    motions filed before this Court.
19              THE COURT:  Thank you.  That's helpful.
20         Just as an interesting aside, I don't know if you're
21    aware, but three of the five positions in Seattle have been
22    vacant for two-and-a-half years, and we now have new
23    nominations.  But we don't expect those to move through
24    quickly.  So please bear with us, and we'll work on your
25    motions.
```

Bund v. Safeguard, 7/18/18

1          All right.  Thank you, Counsel.

2                         (Adjourned)

3

4                  C E R T I F I C A T E

5

6          I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.

7

8    /s/ *Andrea Ramirez*

9    ANDREA RAMIREZ
     COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25